THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD G. McNEELEY, JR., Defendant-Appellant.

Third District   No. 3—90—0581

Opinion filed June 20, 1991.

Peter A. Carusona, of State Appellate Defender's Office, of Ottawa, for appellant.

Kevin W. Lyons, State's Attorney, of Peoria (Terry A. Mertel, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE STOUDER delivered the opinion of the court:

The defendant, Edward G. McNeeley, Jr., was charged by indictment with unlawful possession of more than 900 grams of cocaine and unlawful possession with intent to deliver more than 900 grams of cocaine (Ill. Rev. Stat. 1989, ch. 56½, pars. 1402(a)(11), 1401(a)(11)). Following a jury trial, the defendant was acquitted of those charges but convicted of the lesser included offenses of possession of more than 15 but less than 100 grams of cocaine and possession with intent to deliver more than 15 but less than 100 grams of cocaine (Ill. Rev. Stat. 1989, ch. 56½, pars. 1402(a)(2), 1401(a)(2)). The trial court subsequently sentenced him to a term of seven years' imprisonment.

On appeal, we found that Judge Bumgarner had erred in denying the defendant's motion to have a different judge hear his motion for a new trial. Our decision was based on the fact that the

motion for a new trial directly attacked Judge Bumgarner's conduct during the reading of the jury verdicts. We therefore remanded the cause with instructions that a different judge would consider the merits of the defendant's motion for a new trial and would conduct a new sentencing hearing if he denied that motion. *People v. McNeeley* (3d Dist. 1990), No. 3—89—0395, (unpublished order under Supreme Court Rule 23).

Following a hearing on remand, Judge McCuskey denied the defendant's motion for a new trial. Judge McCuskey thereafter resentenced him to seven years' imprisonment. The defendant appeals.

The record shows in relevant part that at the defendant's trial the State presented considerable circumstantial evidence showing that the defendant possessed over 900 grams of a substance containing cocaine, along with paraphernalia used in selling cocaine. At the conclusion of the evidence, the jury received instructions on the charged offenses and also on the lesser offenses of possession of more than 15 but less than 100 grams of cocaine and possession with intent to deliver more than 15 but less than 100 grams of cocaine. Following deliberations, the jury returned with four verdicts.

The trial judge read the first two verdicts, which found the defendant not guilty of possession of more than 900 grams of cocaine and not guilty of possession with intent to deliver 900 grams of cocaine. After reading the second not guilty verdict, the judge stated: "And now you know why we can't do much with narcotics, and you're excused. Thank you very much." He then dismissed the jury, left the bench, and went to his chambers.

After learning that he had not read all of the verdicts, the judge returned to the bench and instructed the jury to return to the jury box. The last two verdicts found the defendant guilty of possession of more than 15 but less than 100 grams of cocaine and guilty of possession with intent to deliver more than 15 but less than 100 grams of cocaine. The judge subsequently ordered the jury polled and all of the jurors affirmatively stated that those were the verdicts they had reached. He then apologized to the jury for going off "half-cocked" and discharged them.

At the hearing on remand, bailiff Harry Rohleder testified that he was the bailiff in the courtroom when the events in question occurred. He stated that when the judge made the above-quoted statement, he sounded a little angry. The judge then got up and walked out of the courtroom. Rohleder told the jurors to go into the jury room, which they did. As they were getting ready to leave, the

judge asked them to be reseated in the jury box. A minute or two had passed between the time the judge left the bench and when he returned. Rohleder noted that no one went into the jury room with the jurors, and no one talked with them at any time in his presence. He further noted that when the judge initially made his comments and left, the jurors just looked at each other and shrugged or smiled.

Courthouse security officer Kenny Mack testified that after the trial judge read the first two verdicts, he threw down the verdict forms, jumped up, and quickly went into his chambers. The jurors looked upset and started talking among themselves. They then went into the jury room. After one to two minutes, the judge returned. Mack noted that at one point before the judge returned, one or two of the jurors went out the gate that divides the audience from the rest of the courtroom, but were told to come back by the bailiff.

On cross-examination, Mack stated that the jurors were unable to hear anything the assistant State's Attorney said to the judge in his chambers. He also noted that although he handcuffed the defendant, it was done outside the sight of anyone in the courtroom. Mack acknowledged that while the events in question were transpiring, he was busy escorting the defendant out of the courtroom and was paying attention to him.

Marcia Straub, the defendant's trial attorney, testified that the judge made the statement in question in a loud angry voice, swung his hands in the air, got up, and literally ran off the bench. She noted that it was possible the jurors heard the defendant expressing his relief to his girlfriend after the first two verdicts were read. Straub also noted that the jurors appeared upset and angry. She and the defendant then walked out of the courtroom. At the time, the jurors were talking to each other in the jury room and the bailiff was with them. When the judge returned after about three minutes, the jurors were still in the jury room or coming back into the jury box. She did not see any of them anywhere else.

Deputy circuit clerk Linda Smiddy testified that she was clerking for the trial judge at the time. After the judge read two of the verdicts, he handed all four forms to her and left the courtroom. She immediately went after him and handed him the four verdict forms, telling him he had failed to read two of them. No more than two minutes passed between the time he left and when he returned. When she and the judge returned to the courtroom, the jurors were scattered, but were all in the room.

The motion judge found that there was no evidence the trial judge's comments had prejudiced the defendant, coming as they were after the jury had returned unanimous verdicts. The judge noted that the jury's deliberations were uneventful and that the defendant had presented no direct evidence that the polling process was tainted in any way.

On appeal, the defendant argues that he was denied his right to properly poll the jury on the guilty verdicts because the trial judge's statements and conduct insured that no juror would voice any dissent with respect to the verdicts.

■ The purpose of polling a jury is to determine that the verdict accurately reflects each juror's vote as reached during deliberations and that the jurors' votes were not the result of force or coercion. (*People v. Williams* (1983), 97 Ill. 2d 252, 454 N.E.2d 220.) For the comments of a judge to constitute reversible error, the defendant must show that the remarks were prejudicial and that he was harmed by them. (*People v. Garcia* (1988), 169 Ill. App. 3d 618, 523 N.E.2d 992.) The mere possibility of harm to the defendant is not sufficient grounds for holding that a jury poll was improper. *People v. Chandler* (1980), 88 Ill. App. 3d 644, 411 N.E.2d 283.

■ Here, the defendant's appeal argument is necessarily speculative, since there was no direct evidence that any juror was precluded from voicing his dissent due to the trial judge's behavior. While it is certainly possible to envision situations where a judge's behavior would mandate a presumption that he had improperly influenced the jury polling, this is not such a case. The instant judge's actions, while improper, left a question of fact as to whether the jury polling had been tainted. The judge hearing the motion for a new trial determined from the evidence presented that the defendant had failed to meet his burden of showing that the polling was tainted. While that evidence included some testimony that the jurors were upset and scared by the judge's outburst, it also included testimony indicating that the jurors were unfazed by the outburst. Under these circumstances, we find that the motion judge did not abuse his discretion in finding that the defendant was not entitled to a new trial.

The defendant further argues that it was reversible error to receive the jury's guilty verdict after the jury was discharged and the court had lost control of it. He relies upon *People v. DeStefano* (1965), 64 Ill. App. 2d 389, 212 N.E.2d 357, where the trial court improperly accepted a guilty verdict after declaring a mistrial. In *DeStefano*, the jury foreman told the court the jury could not reach

a verdict. The court declared a mistrial and released the jurors, who left the box, returned to the jury room, and engaged in conversation with the bailiff and an assistant State's Attorney. The court then learned that the jury had in fact found the defendant guilty with respect to one charge and was hung only as to a second charge. After the bailiff retrieved the signed guilty verdict form from the jury room, where it had been left, the trial court accepted the verdict. The appellate court reversed, holding that the trial court had lost control of the jury and that the integrity of the verdict was called into question.

In cases of this type, the pivotal question is whether the trial court lost control of the jury, *i.e.*, whether the protective shield which must surround a jury was removed, allowing the jurors to be influenced by improper outside factors. (*People v. Gale* (1971), 132 Ill. App. 2d 986, 271 N.E.2d 94.) Here, unlike *DeStefano*, we note that either the judge or the deputy circuit clerk retained control over all the signed verdict forms throughout the events in question. Further, the judge hearing the motion for a new trial could have properly concluded from the evidence that the court never lost control of the jurors. One witness indicated the jurors might have heard the defendant talk with his girlfriend. Another witness, who admitted that he was paying more attention to the defendant than to the jurors, indicated that one or two jurors might have gone through the gate. The bulk of the evidence showed, however, that the jurors simply went back to the jury room by themselves, then returned to the jury box when the judge returned. Under these circumstances, the motion judge could have properly concluded that the jurors were subjected to no improper outside influences.

Accordingly, the judgment of the circuit court of Peoria County is affirmed.

Affirmed.

BARRY and GORMAN, JJ., concur.