**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROCKY DIETZ, *Plaintiff-Appellant*, <br><br> v. <br><br> HILLARY BOULDIN, *Defendant-Appellee*. | No. 13-35377 <br><br> D.C. No. 2:11-cv-00036-RWA <br><br> OPINION |

Appeal from the United States District Court
for the District of Montana
Richard W. Anderson, Magistrate Judge, Presiding

Argued and Submitted
February 4, 2015—Seattle, Washington

Filed July 24, 2015

Before: Raymond C. Fisher, Carlos T. Bea
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Fisher;
Concurrence by Judge Bea

## SUMMARY[*]

### Jury Trial

The panel affirmed the district court's judgment, and held that the district court did not abuse its discretion in re-empaneling a jury shortly after dismissal where the jurors were not exposed to any outside influence that would compromise their ability to fairly reconsider the verdict.

The panel held that the standard of review for a district court's decision to re-empanel discharged jurors was abuse of discretion. As a matter of first impression in the circuit, the panel held that in limited circumstances, a district court may recall a jury shortly after it has been dismissed to correct an error in the verdict, but only after making an appropriate inquiry to determine that the jurors were not exposed to any outside influences that would compromise their ability to fairly reconsider the verdict. The panel further held that the record supported the district court's finding that the jurors were not exposed to prejudicial outside influences during the brief period of the dismissal.

Concurring in the judgment, Judge Bea agreed with the majority that the district court did not err in re-empaneling the jury in this case. Judge Bea, however, did not agree that the district court judge should be required to undertake "an appropriate inquiry" into whether prejudicial influences tainted the jury.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Geoffrey C. Angel (argued), Angel Law Firm, Bozeman, Montana, for Plaintiff-Appellant.

John F. Bohyer and Jesse Beaudette (argued), Bohyer, Erickson, Beaudette & Tranel PC, Missoula, Montana, for Defendant-Appellee.

## OPINION

FISHER, Circuit Judge:

We consider, as a matter of first impression in this circuit, whether a jury can be recalled shortly after it has been ordered discharged. Joining the majority of circuit courts to have decided the issue, we hold a district court may re-empanel a jury shortly after dismissal, but only if, during the period of dismissal, the jurors were not exposed to any outside influences that would compromise their ability to fairly reconsider the verdict.

## BACKGROUND

Hillary Bouldin's vehicle collided with Rocky Dietz's in August 2009. Dietz subsequently filed a negligence complaint in Montana state court against Bouldin for "injuries including to his low back" and "physical pain, suffering, grief, anxiety and a loss of course of life" stemming from the accident. The case was subsequently removed to federal court.

Before trial, Bouldin admitted he was at fault and that Dietz was injured as a result of the accident. The parties stipulated to $10,136 in past expenses Dietz incurred as a result of the accident. The only disputed issue at trial was the amount of future damages Bouldin owed Dietz. Dietz presented evidence he would need regular physical therapy, medication and injections to alleviate the pain he was experiencing following the accident. Bouldin emphasized that Dietz had a long list of medical conditions predating the collision, that only some of his medical expenses were related to the accident and that he was exaggerating the amount of treatment he would actually seek.

During closing argument, Bouldin's counsel reminded the jury of the stipulated amount of past damages and explained that its award additionally had to include the reasonable value of necessary care, treatment and services received and those reasonably probable to be required in the future. He suggested the jury award Dietz an amount "somewhere between ten and $20,000, depending on what you feel his relief is, what level of pain he has, and how his condition has been affected by this automobile accident."

During deliberations, a juror sent the following question to the judge: "Has the $10,136 medical expenses been paid; and if so, by whom?" The court responded that the information was not germane to the jury's verdict. Speaking to the parties' counsel, the court then observed:

> What I'm wondering – [l]et's just do a little speculating on our own. If we end up with a verdict in less than that amount, and I can't believe that would happen, but if this is what we're heading toward, that would be grounds

for a mistrial and I don't want a mistrial. Do you think they understand clearly, after the argument and the instructions, that their verdict may not be less than that amount?

Bouldin's counsel said he had made the point "crystal clear," and the court agreed. Accordingly, the court took no further action to instruct the jury to award at least $10,136 in damages. The jury returned with a verdict, finding for Dietz but awarding him damages in the amount of $0. The court asked counsel if they would like the jury polled, and both declined. The court then thanked the jurors for their time, told them they were "free to go," discharged them and recessed. Realizing the verdict was a legal impossibility given the stipulated damages exceeded $10,000, the court quickly called back the jurors, noting for the record it was doing so "moments after having dismissed them." It told the jurors their verdict violated the stipulation, inquired whether any of them had experienced undue outside influence in the period following dismissal and, when they collectively responded they had not, ordered them to reconvene the following morning to issue a new verdict consistent with the stipulation. Dietz objected to this procedure and moved for a mistrial, arguing recall was not appropriate because the jury had been dismissed. The jury again found for Dietz and awarded him damages in the sum of $15,000. Dietz timely appealed.

## DISCUSSION

Dietz argues the district court erred by recalling the jury after it had already been dismissed. Given the circumstances here, where the court promptly recalled the jurors, questioned them and found they were not exposed to prejudicial

influence during the brief duration of their dismissal, we conclude the recall was not an abuse of discretion. We thus affirm the judgment.[1]

## I.   Standard of review

We first address the correct standard of review for a district court's decision to re-empanel discharged jurors. Dietz argues "the judgment is void because the district court acted in a manner inconsistent with due process of law," so we must review de novo the district court's decision to re-empanel the jurors. Bouldin counters that the correct standard should be abuse of discretion because Dietz requests a new trial based on an alleged error committed by the district court.

Federal Rule of Civil Procedure 60(b)(4) provides relief from a final judgment if it is void as a matter of law. The list of such judgments is "exceedingly short," and "Rule 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010).

Here, Dietz does not allege that the court lacked jurisdiction to enter the judgment or that he was deprived of notice or an opportunity to be heard. Instead, he argues the court should have granted his motion for a mistrial because the verdict did not comply with the stipulated damages. Denials of motions for mistrial are reviewed for abuse of

---

[1] We address Dietz's remaining arguments in a concurrently filed memorandum disposition.

discretion. *See United States v. Hagege*, 437 F.3d 943, 958–59 (9th Cir. 2006). Therefore, that is the standard of review we apply here.

## II. Legal standard

Our circuit has not yet addressed when a district court abuses its discretion by recalling jurors after dismissing them.**[2]** Therefore, we must decide what legal standard governs our analysis.

Typically, a jury is no longer an entity after the court discharges it, and its duties "are presumed to be at an end when its verdict has been rendered, received, and published." *Summers v. United States*, 11 F.2d 583, 586 (4th Cir. 1926). When the jury has "been discharged altogether and relieved, by the instructions of the judge, of any duty to return . . . . it has ceased to be a jury, and, if its members happen to come together again, they are there as individuals, and no longer as

---

**[2]** We have upheld the district court's decision to reconvene a jury five weeks after trial to clarify an ambiguous verdict. *See E.F. Hutton & Co. v. Arnebergh*, 775 F.2d 1061, 1063–64 (9th Cir. 1985). In that case, however, we did not need to reach the issue of whether such a recall was permissible because the parties had stipulated to the procedure. *See id.* at 1064.

We have also encountered the question of jury reassembly in other contexts. *See, e.g.*, *Harrison v. Gillespie*, 596 F.3d 551, 574–75 (9th Cir. 2010) (refusing to allow jury to be reconvened three years after death penalty trial), *rev'd on other grounds en banc*, 640 F.3d 888 (9th Cir. 2011); *United States v. Boone*, 951 F.2d 1526, 1532 (9th Cir. 1991) (rejecting proposal to reconvene a jury for polling over two years after the trial had ended); *United States v. Washington*, 819 F.2d 221, 224–25 (9th Cir. 1987) (refusing to recall jury two years after trial to question individual jurors about potential prejudice).

an organized group, an arm or agency of the law." *Porret v. City of New York*, 169 N.E. 280, 280 (N.Y. 1929) (opinion of Cardozo, C.J.). Correspondingly, the "protective shield" imposed by the district court, which prevents jurors from being subjected to prejudicial outside influences, is removed upon dismissal. *United States v. Figueroa*, 683 F.3d 69, 73 (3d Cir. 2012); *see also United States v. Marinari*, 32 F.3d 1209, 1214 (7th Cir. 1994) (observing that "after discharge, the jurors are quite properly free to discuss the case with whomever they choose").

Nevertheless, several courts have recognized that in certain limited circumstances, a district court may recall a jury immediately after dismissal to correct an error in its verdict. *See Figueroa*, 683 F.3d at 73; *United States v. Rojas*, 617 F.3d 669, 677 (2d Cir. 2010); *Marinari*, 32 F.3d at 1215. These courts look at the totality of circumstances to determine whether the jurors were exposed to prejudicial outside influence before the recall. *See Wagner v. Jones*, 758 F.3d 1030, 1034 (8th Cir. 2014), *cert. denied*, 135 S. Ct. 1529 (2015) ("One line of authority . . . requires a case-specific analysis of 'whether the jurors became susceptible to outside influences and [were] beyond the control of the court once discharged.'" (quoting *Figueroa*, 683 F.3d at 73)). This line of cases appears to originate from *Summers v. United States*, 11 F.2d 583.

In *Summers*, immediately after the district court pronounced the jury discharged but before the jurors dispersed, the court realized it had read one of the charges to the jury outside the presence of the defendant. *See* 11 F.2d at 586. Because the jurors had not yet left their seats, the court set aside the verdict, reread the charge in the presence of the defendant and sent the jurors to deliberate anew. *See id.* The

defendant objected, contending this process was improper because the jury had been discharged. *See id.* The court observed it would be "guilty of a very technical ruling" if it held the jury was dismissed before it had even left the box. *See id.* The Fourth Circuit sustained the court's actions, holding that a jury

> may remain undischarged and retain its functions, though discharge may have been spoken by the court, if, after such announcement, it remains an undispersed unit, within control of the court, with no opportunity to mingle with or discuss the case with others, and particularly where, as here, the very case upon which it has been impaneled is still under discussion by the court, without the intervention of any other business.

*Id.*

Other circuits have extended the *Summers* rule to situations where the jurors have been released but effectively remained under control of the court.[3] For example, the Third

---

[3] In *Summers*, the jurors had not yet left the jury box and therefore had no "'opportunity' to encounter an outside influence." *Wagner*, 758 F.3d at 1035 n.9 (quoting *Summers*, 11 F.2d at 586). As the Eighth Circuit explained, "[i]n any meaningful sense, once a juror leaves direct judicial supervision in the courtroom, he or she virtually always has the 'opportunity' to encounter outside influences." *Id.* *Summers* did not address whether jurors who had briefly left the courtroom could validly be recalled. Later cases have relied on *Summers* for the more basic proposition that a jury may be recalled shortly after it has been discharged if it was not exposed to prejudicial outside influences during dismissal,

Circuit upheld a district court's decision to re-empanel a jury where the court "immediately sent a court employee to hold the jury" after initially releasing it. *Figueroa*, 683 F.3d at 72. The court considered the "pivotal inquiry" to be whether the jury "became susceptible to outside influences" during the dismissal. *Id.* at 73 (noting "[t]he jurors did not disperse and interact with any outside individuals, ideas, or coverage of the proceedings").

Similarly, the Second Circuit upheld a district court's decision to reconvene a dismissed jury to clarify a technical error in the verdict. *See Rojas*, 617 F.3d at 677. The court was informed of the error six minutes after the jurors had been discharged, at which point they had returned to the deliberation room. *See id.* at 673, 678 n.3. The circuit court noted the jurors had not been "exposed to outside factors" during the brief discharge, so recall was proper. *See id.* at 678 (internal quotation marks omitted).

The Seventh Circuit has also recognized that "[u]ntil the jury is actually discharged by separating or dispersing (not merely [by] being declared discharged), the verdict remains subject to review." *Marinari*, 32 F.3d at 1214. In that case, defense counsel requested a poll of the jury after the jurors had left the courtroom, but while they remained sequestered in the jury room awaiting a security escort to the parking lot. *See id.* at 1215. The court concluded that, although the jurors had been declared dismissed, they "had not dispersed and they remained untainted by any outside contact." *Id.* Thus, they were available to be recalled and polled. *See id.*

---

even where jurors have left the courtroom. *See, e.g.*, *Figueroa*, 683 F.3d at 73.

By contrast, a handful of state courts and, most recently, the Eighth Circuit, have eschewed this case-specific analysis and instead adopted a restrictive bright-line rule prohibiting recall once the jurors have left the confines of the courtroom. *See Wagner*, 758 F.3d at 1035 ("[W]here a court declares a mistrial and discharges the jury which then disperses from the confines of the courtroom, the jury can no longer render, reconsider, amend, or clarify a verdict on the mistried counts."); *see, e.g.*, *Spears v. Mills*, 69 S.W.3d 407, 413 (Ark. 2002) (noting the "strict" and "absolute" rule that a jury may not be recalled once it has "left the presence and control of the court").

In *Wagner*, the Eighth Circuit case, the jurors, who were deliberating on two counts, told the court they were deadlocked after two and a half days of deliberations. *See* 758 F.3d at 1032. The court declared a mistrial and thanked the jurors for their service. *See id.* at 1033. Two minutes later, the court reassembled the jurors because it had failed to ask whether they were deadlocked on one or both counts. *See id.* The foreperson said the jury had reached a verdict for the defendant on Count I, and the court accordingly amended the previous mistrial ruling over the plaintiff's objection. *See id.* The Eighth Circuit reversed, holding the error in the verdict was "beyond correction after the jury left the courtroom." *Id.* at 1036.[4]

---

[4] The facts in *Wagner* were much more suggestive of prejudicial influence than the facts here. There, the court had declared a mistrial on the very charges the jury was then recalled to deliberate. As the Eighth Circuit noted, "nothing indicate[d] that the jury understood that the case was being placed back in their hands, and that they were being re-polled essentially to rescind the mistrial." 758 F.3d at 1036. Furthermore, the judge had provided the jurors with "letters" to complete and send back to the court as a post-trial assessment as to which the judge specifically told

We recognize there are some advantages to the Eighth Circuit's rule. As that court observed, it "offers better guidance than an amorphous rule," *id.* at 1035, and it is more straightforward to apply than the totality-of-circumstances approach. In addition, by foreclosing the possibility of recall after jurors have left the courtroom, it is theoretically more protective of litigants' right to a jury untainted by improper external influence. *See id.* at 1036 n.10 (observing that "even in civil cases, both the litigants and the public must have the utmost confidence that verdicts remain untainted"); *see also Lahaina Fashions, Inc. v. Bank of Hawaii*, 297 P.3d 1106, 1118 (Haw. Ct. App. 2013) (opining that forbidding recall once jurors have left the courtroom "offers the greatest protection against the erosion of public confidence in juridical impartiality"). The Eighth Circuit emphasized that, "[i]n this age of instant individualized electronic communication and widespread personal control and management of pocket-sized wireless devices," such a restrictive rule better protects against improper external influence. *Wagner*, 758 F.3d at 1035.

Precisely because we live in an age of instant electronic communication, however, there is nothing talismanic about the courtroom door. For that reason, we should not adopt such a rigid rule. Jurors can easily send messages and communicate with outside parties before stepping out of the jury box, let alone the courtroom. Once a court has discharged the jurors, thus lifting the "protective shield" and

---

them: "If there's something about this case that we need to know about, this is your opportunity to tell us." *Id.* (alteration omitted). At this point, the admonition not to discuss the case with others had been lifted, and there was no information in the record about the jurors' conduct once they had dispersed from the courtroom. *See id.*

enabling them to discuss the case with others, it triggers the potential for prejudicial influence.

But at the same time, just because jurors may potentially engage in improper outside contacts the moment they are dismissed does not mean they actually do. Regardless of whether the dismissed jurors have remained in the courtroom or left, before deciding to recall them, district judges must conduct a proper inquiry into the circumstances to ensure jurors were not exposed to prejudicial influences during the brief period of dismissal. The court – and, if permitted by the court, counsel – can specifically question the jurors about what they did during the moments they were dismissed, and through its evaluation of their responses and observations of the courtroom, determine whether recall is appropriate.

Such a rule strikes a sensible balance between considerations of fairness and economy and allows for a cost-effective alternative to an expensive new trial. In the somewhat analogous context of resubmission of special verdict questions, we explained that "[a]llowing the jury to correct its own mistakes conserves judicial resources and the time and convenience of citizen jurors, as well as those of the parties" and "best comports with the fair and efficient administration of justice." *Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1058 (9th Cir. 2003).[5] We give weight to those same principles by adopting the totality-of-circumstances approach here. That said, recall should be the

---

[5] An important factual difference between *Duk* and this case is that the jury in *Duk* had not been declared discharged, nor had it dispersed. *See id.* at 1058. Nevertheless, the policy considerations underlying *Duk* are relevant here, where the jury was dismissed for a matter of moments and was still available to be recalled.

exception rather than the convenient rule, lest the sanctity of untainted jury deliberations be compromised.

In sum, we hold that, in limited circumstances, a court may recall a jury shortly after it has been dismissed to correct an error in the verdict, but only after making an appropriate inquiry to determine that the jurors were not exposed to any outside influences that would compromise their ability to fairly reconsider the verdict.[6,7] *See Figueroa*, 683 F.3d at 73 (holding the "pivotal inquiry is whether the jurors became susceptible to outside influences"). In deciding whether recall is proper, the district court "must evaluate the specific scenario presented in order to determine whether recalling the jury would result in prejudice to the [parties] or undermine the confidence of the court – or of the public – in the verdict." *Rojas*, 617 F.3d at 677.

---

[6] We presume for purposes of this holding that one party objects to the recall procedure. Such an inquiry may not be necessary where the parties have explicitly stipulated to the recall procedure. *Cf. E.F. Hutton & Co., Inc. v. Arnebergh*, 775 F.2d 1061, 1063–64 (9th Cir. 1985) (upholding court's recall of jurors five weeks after they were discharged to interview them about the verdict because parties had stipulated to the procedure).

[7] The concurrence contends such an inquiry is "inconsistent with our system of adversarial justice." In the context of jury management, however, the district court regularly engages in such inquiries, as the cases the concurrence itself cites reveal. *See, e.g.*, *United States v. Vartanian*, 476 F.3d 1095, 1098–99 (9th Cir. 2007) (describing district court's "careful interview" of jury members before dismissing juror for good cause); *United States v. Symington*, 195 F.3d 1080, 1086 (9th Cir. 1999) (explaining the trial court's "investigative power . . . puts it in the best position to evaluate the jury's ability to deliberate" (quotation marks omitted)). Our holding here is entirely consistent with the principle that, once a district court has been made aware of a problem relating to jury deliberations, it must investigate the problem. Of course, the details of the investigation remain within the district court's discretion.

### III.    Application

Having concluded the totality of circumstances analysis is proper, we next consider whether the jurors here were in fact exposed to prejudicial outside influences during the brief period of the dismissal.  Because the record supports the district court's finding they were not, recalling them was not an abuse of discretion.

When the court called back the jurors, it noted for the record that it was doing so "moments after having dismissed them."  In *Figueroa*, the district court had "retained control of the jury at all times after it informed the jurors they were released," 683 F.3d at 73, because it had "immediately sent a court employee to hold the jury" after initially releasing it, *id.* at 72.  Similarly, here, the record reflects that the court "just stopped the jury from leaving the building when [it] told them they were dismissed," because "in a fairly quick second thought," the court realized the verdict was "not legally permissible."  Given the court was able to recall the jurors promptly after dismissal, it appears they had not yet dispersed.  *Cf. id.* at 73 (noting that, although jury had been "momentarily released," they had not "disperse[d]"); *Rojas*, 617 F.3d at 678 & n.3 (six minutes between jury discharge and reassembly suggested jury had not "dispersed").

Dietz argues the jury had dispersed because at least one juror had left the floor, or possibly the building, to get his hotel receipt and other jurors were observed talking to the clerk of court in the courtroom.[8, 9]   After Dietz's counsel

---

[8] The record is inconsistent as to whether the juror who left exited the building or just the floor.  The clerk of court noted for the record that "there was one [juror] that left the building to go get his hotel receipt."

voiced this concern, the court asked the jurors whether "anything occurr[ed] during the . . . few minutes after you were discharged where you talked to anybody about the case outside your immediate numbers." The jurors responded they had not:

> JURY PANEL VOICES: No, sir. No.
>
> THE COURT: Did we get everybody stopped in time for that not to occur?
>
> JURY PANEL VOICES: (Heads nod) Uh-huh, yes.
>
> JUROR: I didn't. You did. Most of us were just outside the door here. And there was only two that went down the –
>
> THE COURT: That's what I tried to do. I understand one juror had gone to the first floor and it was maybe to get a hotel receipt.
>
> JUROR: I did that, but I didn't talk to anybody.

---

When the court quizzed the jurors, it asked if any of them had gone to the "first floor," "maybe to get a hotel receipt," and one juror responded, "I did that, but I didn't talk to anybody."

[9] While registering this objection, Dietz's counsel said he had observed certain jurors talking to the clerk of court but conceded he was "not at all" suggesting that there was substantive discussion about the case.

THE COURT: You didn't talk to anyone. So, in terms of you being contaminated by any outside information, that is not a factor.

JUROR: No.

JURY PANEL: No.

This colloquy supports the conclusion the jury had not "disperse[d] and interact[ed] with any outside individuals, ideas, or coverage of the proceedings." *Figueroa*, 683 F.3d at 73. Importantly, the district court specifically asked the jurors whether they had spoken to anyone about the case. It also asked them whether they had been "contaminated by any outside information." The jurors responded they had not. The court was in the best position to evaluate the jurors' responses, including the credibility of those responses.

Because the right to an impartial, untainted jury is of utmost importance, we do note that an individualized examination would be preferable to the collective questioning employed here – whether by asking jurors to respond individually or by questioning each juror separately.[10] During such an inquiry, the court or counsel could ask specific questions to discern whether any juror was susceptible to prejudicial influence, such as what the jurors did during the dismissal; whether they spoke to anyone, and, if so, the content of their conversations; whether they overheard discussions about the case; whether they used cell phones or

---

[10] The extent of questioning required may depend on the length and complexity of the case. Those involving longer trials or more complex issues may require a more searching, individualized examination.

other devices to communicate; and whether they were influenced by any discussions they had or overheard.[11]

That the jurors were recalled to deliberate anew upon a substantive matter rather than simply to correct a technical error does not change our conclusion. *Cf. Rojas*, 617 F.3d at 678 & n.3 (limiting holding to correction of technical errors). There was no evidence the jury had been tainted by improper influence during the momentary dismissal. *Cf. Figueroa*, 683 F.3d at 73 (upholding district court's decision to recall jury after momentary dismissal to deliberate on an additional count it had not initially considered). Furthermore, the jury's initial verdict appears to have resulted from a misunderstanding regarding the effect of the legal stipulation.[12] *Cf. Sierra Foods v. Williams*, 816 P.2d 466, 467

---

[11] The court, in its discretion, may also afford counsel an opportunity to voir dire the jurors along these lines as well. Plaintiff's counsel did not request that opportunity here nor object to the group questioning.

[12] This misunderstanding could have been avoided altogether had the parties submitted the written stipulation into evidence and proposed a jury instruction on the issue. During the first round of deliberations, the jury sent a note asking the court if the stipulated $10,136 in medical expenses had been paid and by whom. The court responded that this consideration was irrelevant. At this juncture, the court could have instructed the jury that it needed to award at least the stipulated damages plus some additional amount. Unfortunately, it did not do so. However, after realizing the error in the verdict and recalling the jurors, this is exactly what the court did. It explained to the jurors:

> There was never any dispute, it was admitted from the beginning in this case, that the medical bills of $10,136.75 were caused by this collision . . . . It doesn't matter by whom or to whom. That was the admission in the case. So the verdict as a starting point has to be at least $10,136.75. . . . Secondly, it was

(Nev. 1991) (upholding recall of jury to correct a damages award that failed to account for its contributory negligence finding).

In conclusion, the district court did not abuse its discretion by recalling the jurors in lieu of declaring a mistrial. First, and importantly, the recall occurred very shortly after the dismissal. Although the court might have conducted an individualized and more detailed inquiry, its questioning adequately confirmed the jurors had not been exposed to prejudicial influences during the brief period between dismissal and recall. The court's decision to recall the jurors was thus not an abuse of discretion.

**AFFIRMED.**

---

admitted by the Defendant that some injury occurred in this accident. . . . That being the case, your verdict had to be $10,136.75 plus some other and additional reasonable amount as compensation for the injury which you find was inflicted.

Thus properly instructed, the jury was quickly able to come to a verdict consistent with the legal stipulation.

BEA, Circuit Judge, concurring in the judgment:

I agree with the majority that the district court judge did not err in re-empaneling the jury in this case. I further agree with the majority's conclusion that the district court judge may re-empanel a jury only if he finds that the jury was "not exposed to any outside influences that would compromise their ability to fairly reconsider the verdict." Maj. Op. at 14. I do not agree, however, that the district court *judge* should be required to undertake "an appropriate inquiry" into whether prejudicial influences have tainted the jury. *Id.* Because the majority's adoption of this duty of inquiry is inconsistent with our adversarial system of justice, I concur only in the judgment. I also note the majority cites no statute, case, or regulation that imposes such a duty of inquiry on the district court.

Our system of justice is an adversarial one. "What makes a system adversarial rather than inquisitorial is not the presence of counsel," but "the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the bases of facts and arguments pro and con adduced by the parties." *McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2 (1991). Consistent with this principle, our court has never required district court judges develop—by interrogation of witnesses—the record on which they render judgments; instead, we require district court judges to make specific findings based on the evidence that the parties place in the record.[1]

---

[1] There is one exception to the principle I have stated: when the question before the court is whether a party has received adequate representation, there is reason to distrust the parties' ability (or motive) to develop a full

Thus, for example, Federal Rule of Criminal Procedure 23 states that a district court can excuse a seated juror in a criminal case, but only if the district court finds that "good cause" exists. And when the record does not support a district court's finding that good cause existed, we do not hesitate to tell it so. *See, e.g.*, *United States v. Symington*, 195 F.3d 1080, 1088 (9th Cir. 1999) (finding district court erred in dismissing juror when record showed reasonable possibility that juror's view of merits of case were basis of removal). But we have never held that a district court has any duty to interrogate jurors to develop that record, or that it would be reversible error for a district court to accept the parties' submission that the record was sufficient for it to rule.[2]

Nor should we. District court judges are "in the best position to evaluate the jury's ability to deliberate," and should be accorded the widest latitude in determining how to

record. Thus, for example, a court cannot accept a guilty plea unless it has "determine[d] that the defendant understands" the rights he gives up by pleading guilty, thereby ensuring that a defendant who waives his right to trial is doing so in knowing and voluntary fashion. Fed. R. Crim. P. 11(b). Here, by contrast, the majority does not argue (and there is no reason to think) that the parties are incapable or unwilling to develop the necessary record by interrogation of the witnesses.

[2] Of course, much as an appellate court judge may choose to research a legal point not fully presented in the parties' briefs, a trial court may choose to participate in development of the record, by (for example) asking questions itself of jurors accused of improper conduct. Indeed, district court judges often question jurors accused of improper conduct to determine whether the juror may continue to serve, in part because a party's lawyer may not be keen to ask hard questions of a juror about to decide his client's case. Salutary though this practice may be, no court has ever made it *mandatory* in the manner of today's majority opinion.

make that evaluation. *United States v. Vartanian*, 476 F.3d 1095, 1098 (9th Cir. 2007) (quoting *United States v. Beard*, 161 F.3d 1190, 1194 (9th Cir. 1998)). Indeed, this court has, for more than three decades, considered trial courts "uniquely qualified" to evaluate the possibility that a juror has been biased. *United States v. Bagnariol*, 665 F.2d 877, 885 (9th Cir. 1981). Despite this presumption, the majority creates a new, unnecessary requirement that will hinder the ability of district court judges to manage the jury as they see fit.

In sum, the majority's rule is inconsistent with both basic principles of adversarial procedure and well-founded principles of appellate deference to trial court judgments. Because I would not mandate any *sua sponte* inquiry by the district court into a matter that the parties are well-equipped to investigate themselves, I concur only in the judgment.